# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Dieter Haggar | * | |
| 437 Clayton Road | * | |
| Alexandria, VA 22304 | * | |
| | * | |
| *Plaintiff*, | * | |
| | * | |
| | * | Case No.: |
| | * | |
| v. | * | |
| | * | |
| | * | |
| Denis McDonough, Secretary, | * | JURY TRIAL DEMANDED |
| U.S. Department of Veterans Affairs | * | |
| 810 Vermont Ave. N.W. | * | |
| Washington, DC 20420 | * | |
| | * | |
| *Defendant*. | * | |
| | * | |
| Serve: | * | |
| | * | |
| Denis McDonough, Secretary | * | |
| U.S. Department of Veterans Affairs | * | |
| 810 Vermont Ave. N.W. | * | |
| Washington, DC 20420 | * | |
| | * | |

## COMPLAINT

COMES NOW, Plaintiff, Dieter Haggar (hereinafter "Plaintiff" or "Mr. Haggar"), by and through his undersigned counsel Dionna Maria Lewis, Esq. complains against Defendant, Denis McDonough, Secretary, U.S. Department of Veterans Affairs (hereinafter "Defendant," "VA" or "Agency") and in support thereof states as follows:

1

## INTRODUCTION

1. This is an action authorized and instituted pursuant to the Fair Labor Standards Act ("FLSA") for the Defendant's unlawful payment and withholding of wages, harassment, and whistleblower retaliation against the Plaintiff in violation of the FLSA.

2. Plaintiff seeks back pay, liquidated damages, interest, attorney's fees and costs pursuant to the FLSA and 28 U.S.C. 1331(a).

3. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331,1337, and Section 16(b) of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, *et seq.*, as it asserts a claim that arises under the Constitution, laws or treaties of the United States, specifically the FLSA, to redress and enjoin employment practices orchestrated by the Defendant.

4. Defendant was and is an employer of Plaintiff as defined by the FLSA.

5. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendant, which operates in Washington, D.C., where Plaintiff worked.

6. Additionally, venue is proper in the Court for the District of Columbia pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendant transacts substantial business in this District, and Defendant maintain employment records related to this action in the District of Columbia.

## NATURE OF THE ACTION

7. Plaintiff brings this action to secure protection of rights granted under the statutes mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief

as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

8. Plaintiff's damages are significant, including, but not limited to, loss wages and backpay, benefits, the loss of reputation, career advantage, emotional tranquility, and denial of his constitutional and statutory rights.

9. The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiff.

## PARTIES

10. Plaintiff, Special Agent Dieter Haggar, has been an Agent of the VA for over three (3) years and resides in Virginia.  He currently works for the VA in Washington, DC.

11. Defendant is a United States governmental agency, which is headquartered in the District of Columbia.

12. During the relevant period, Defendant employed Plaintiff.

13. During the relevant period, Plaintiff was Defendant's employee within the meaning of the FLSA, and thus entitled to the protections of the FLSA.

## FACTUAL ALLEGATIONS

*Facts Relevant to Wage Issues*

14. Plaintiff, Dieter Haggar, has been employed by Defendant, the Department of Veterans Affairs ("VA"), since December 26, 2018, until present, as a Criminal Investigator.

15. As a Special Agent, Plaintiff was was entitled to overtime for all hours worked, in excess of forty hours per week.

16. As a Special Agent, Plaintiff's duties and responsibilities included the personal protection of the Secretary of Veterans Affairs, conducting site advances, protective threat assessments, and investigations.

17. Plaintiff typically and customarily worked at least five (5) days a week.

18. Plaintiff's standard work schedule was a fifty (50) hour work-week due to receiving Law Enforcement Availability Pay (LEAP). Plaintiff was scheduled to work ten (10) hours a day made up of eight (8) standard work hours plus two (2) hours to cover his LEAP pay.

19. Plaintiff earned a daily salary based on a 40-hour workweek, but was not consistently paid overtime, night differentials, or weekend premiums, in violation of the FLSA.

20. Based upon a standard 40-hour work week, Plaintiff earned $2, 815.20 every week, which calculates to $5,630.40 bi-weekly in gross payments.

21. During this period, Plaintiff's hourly rate calculates to $56.30 an hour for 40 hours of work per week.

22. Plaintiff's overtime rate would have been $56.30 per hour as a FLSA exempt employee due to LEAP.

***LEAP Pay Disparities and FLSA Violations***

23. In or around mid-2017, the VA implemented the new Law Enforcement Availability Pay ("LEAP") program which was applicable to the Criminal Investigator 1811 series in the VA's Office of Operations, Security, and Preparedness ("OSP").

24. LEAP was codified into law for criminal investigators and firefighters because of the significant number of unscheduled hours their work requires. The law provides an additional 25% of the base pay for investigators and is accounted for based on an average

of two hours per workday. However, LEAP is not accounted for on holidays, annual leave, travel status, or training.

25. In order to obtain LEAP, agents were required to work an average of two (2) extra hours per day. If the Agents did so, they would receive an additional separate lump sum payment in the amount of 25% of their base pay. Any hours worked past the extra two hours per day were considered overtime and paid at the Agent's regular hourly rate.

26. Accordingly, this new LEAP program impacted the VA Secretary's protection detail, which caused all Special Agents on the protection detail to experience significant pay discrepancies because the VA was attempting to implement a bi-weekly cap on Agents' work hours.

27. As a common management practice or policy through the implementation of the LEAP program, Agents began to lose two (2) hours of scheduled overtime because the Financial Service Center ("FSC") was accounting for LEAP in terms of the deductions of its pay calculation, while the VA office was accounting for LEAP deductions as well.

28. As a result, four (4) hours were being accounted for LEAP for scheduled overtime as opposed to the two (2) hours the law requires. Thus, Agents were not being paid for at least two (2) hours worked past the two (2) required LEAP hours.

29. In essence, an Agent who worked twelve (12) hours a day would have been entitled to their first eight (8) hours at their regular pay, the subsequent two (2) hours were accounted as part of their LEAP requirement, and the last two (2) or more hours would have been paid at the Agent's hourly rate. As a result of four (4) hours being accounted for as LEAP, Agents were losing two (2) additional hours of overtime at their hourly rate.

30. Further, LEAP was being accounted for in the Defendant's calculations on travel status days and federal holidays, which was in violation of OPM guidance and law.

31. Plaintiff was never compensated for the many overtime hours he worked, and the LEAP pay that was inappropriately and illegally taken out of his compensation.

32. Plaintiff and other Special Agents reported these discrepancies to the attention of management in the Office of Security and Preparedness management, including Mr. Daniel Sitterly, then-Assistant Secretary for OSP. However, nothing was done to address the pay disparity, and the issue has not yet been corrected.

33. By way of calculations, the overtime hours that were taken from Plaintiff in which the pay system accounted for LEAP hours twice, and the LEAP hours that were miscalculated and deducted from Plaintiff's pay and compensation on holidays and during travel duty-status, amounted to approximately $45,000.00 that was deprived from Plaintiff, which is still owed to Plaintiff as of this filing.

34. Plaintiff is also approximately owed an additional $1,500.00 for Sunday premiums that he worked but was not paid for.

35. Further, Plaintiff has not been paid approximately $3,000.00 in overtime pay for his work on a trip to the Pacific islands, which occurred in or around July and August 2019.

36. In addition to the LEAP pay issues, the money taken from every member of the Secretary's detail for reaching the biweekly pay cap (but not exceeding the yearly pay cap) was not paid the following year, despite the law requiring that the Agency had to pay the amounts deferred as a lump sum paying the following calendar year.  This policy was lifted in the beginning of the COVID-19 pandemic, but Agents have yet to receive the deferred amounts prior to that time.

37. Additionally, Plaintiff is owed approximately $25,000.00 for money taken out of his wages after reaching the biweekly pay cap, but not being paid by the following year despite not reaching the yearly pay cap.

38. Other relevant pay issues include the fact that Special Agents were not compensated for meal periods by Defendant, as well as Defendant failing to pay Special Agents night differential for scheduled overtime hours between the duty hours of 6:00p.m. and 6:00a.m.

39. Thus, Plaintiff is owed approximately $25,000.00 for lunch period time that was inappropriately and illegally taken from his compensation and is owed approximately $5,000.00 for the night differential compensation that was not provided.

40. Once again, Plaintiff and other Agents reported these issues to the attention of OSP management and Mr. Sitterly for assistance and redress, but their efforts were ignored.

41. These pay disparities and labor violations at issue in this Complainant began in 2018 and have continued until the present.  Throughout the years, Plaintiff reported what he reasonably believed were violations of law, rules, and policy to management—to no avail.

42. Occasionally, Plaintiff would receive a verbal acknowledgment that a meeting would be held to address the pay discrepancies, but those never actually occurred

43. In or around February 2022, Plaintiff learned from Mr. Thomas Napier, Director of Staff, during a meeting updating staff on the pay matters, that the FSC had verbally stated that the money was wrongly withheld from the pay of Agents like Plaintiff on travel days. However, any other pay discrepancy or money not reaching the annual pay limitation would not be paid.

44. Plaintiff also learned that this was not the first time these issues had been brought to the attention of the Agency.  Previously, a class action had been filed against the VA based on

the same pay and retirement issues that Plaintiff and his team were being subjected to. In fact, Ms. Gina Farice, former Assistant Secretary of HR, was aware of and briefed on the pay issues by way of a memorandum that was circulated someone in 2014.

45. On or about April 21, 2022, Plaintiff returned from work travel and submitted an email request for a one (1) hour schedule adjustment to change his work hours from 6 am to 2 pm to 5 am to 1 pm because his work day began at 5 am. This request would have also saved the Agency one (1) hour of overtime and mitigated requesting overtime that he would not be paid because of the coding issue.

46. Additionally on April 21, 2022, Plaintiff submitted a request for Compensatory Time for Travel (CTT) Form with the work hours identified as 5 am to 1 pm.

47. On or about April 25, 2022, Plaintiff received an email from Michael Salva (Plaintiff's supervisor) denying his request and directing that he update his CTT form to his scheduled work hours of 6 am to 2 pm and that the overtime be submitted via email.

48. On or about April 26, 2022, Plaintiff forwarded Mr. Salva's email denying his schedule request to Mr. Napier and requested assistance with the approval of the schedule change. Mr. Napier advised that he would address his request in the April 27, 2022 morning meeting.

49. On or about April 28, 2022, Mr. Salva asked to see Plaintiff in his office, where he was informed that he was being moved to the other work group and was advised that it was to ensure medical training parity between the two groups.

50. On or about April 29, 2022, Plaintiff sent an email to Mr. Salva requesting to remain with the current work group because he did not want the toxic climate of the other work group to jeopardize his career.

51. A few hours after sending the email, Mr. Salva called Plaintiff and requested that he provide the names of the individuals he alleged were responsible for the toxicity, harassment, and unprofessional behavior. Mr. Salva proceeded to state that there was a zero tolerance policy for any harassment or toxicity within the workplace. As the conversation went on, it became obvious that if Plaintiff did not name names, his request would not be considered. As such, Plaintiff informed Mr. Salva that he would answer any questions needed but that Plaintiff would like to confer with legal counsel prior to doing so.

52. After Plaintiff's mention of conferring with counsel, there was a notable shift in Mr. Salva's demeanor and Mr. Salva stated that the mater should be resolved "in house," that they were all "professionals and agents," or words to that effect. Plaintiff offered an alternative solution in which a colleague who had expressed interest in a management position would be moved given that he had already been aware of the environment of the work group. Plaintiff explained that the colleague had the proper training and experience to mentor and hopefully improve the work group. Mr. Salva did not seem inclined to consider the alternative option and once again stated that the supposed reason for Plaintiff's move was to ensure medical training parity. The call ultimately ended with Plaintiff requesting to confer with legal counsel and that he would reach out to Mr. Salva as soon as he had done so.

53. Also on April 29, 2022, Plaintiff spoke with Mr. Napier to ask about his request for a time card adjustment. Mr. Napier verbally communicated that Plaintiff's request was denied because it was more advantageous to the government to keep Plaintiff on his current schedule. Plaintiff asked for clarification as to how submitting one (1) hour of overtime

each day was more advantageous to the government versus a schedule that would not require overtime.  At this point, Mr. Napier corrected Plaintiff and stated that the hours required for the timecard adjustment were in excess of the time required to submit for overtime and therefore it was more advantageous for the government to not approve Plaintiff's request.

54. On or about April 30, 2022, Plaintiff sent Mr. Napier an email documentation of their verbal conversation the day before.

55. On or about May 2, 2022, Plaintiff received an email from Mr. Napier where he advised that there was a correction to the errors noted on Plaintiff's time card and that those errors were corrected with the approval of Plaintiff's supervisor.  Further, Mr. Napier informed Plaintiff that the schedule change was denied because "2c. If the government had agree [sic] to change your schedule request from 6 am to 2 pm to 5 am to 1 pm, [Plaintiff] would have received 7 hours of night differential pay vs. 4 ½ hours of travel comp. This was **not** advantageous to the government. 3. [Mr. Napier] consider[ed] this matter closed."

56. Plaintiff replied to Mr. Napier's email the same day thanking him for his help.  Plaintiff expressed understanding that the language in his email indicated he no longer wished to discuss the matter so Plaintiff requested advice on the appropriate course of action for Plaintiff to address the error in paragraph 1c.

57. Mr. Napier once again responded to Plaintiff's email simply stating that he "said the matter was closed and not sure where [Plaintiff's] translate of [his] email said [he] no longer wished to discuss the matter.  What is the error in para 2c?"

58. The following day, May 3, 2022, Plaintiff replied to Mr. Napier's email apologizing for the misunderstanding and explained the error is in the seven (7) hours of night differential.

The schedule adjustment would only adjust the schedule one hour. Night differential would be applicable from 5 am to 6 am only, the same as the overtime submitted. This would mean that the schedule adjustment would save the government $56.30 (Plaintiff's overtime hourly rate). Finally, Plaintiff explained that the one (1) hour schedule adjustment would save the government from paying overtime that would never be received and that the hours would be accurately documented on Plaintiff's timecard because he worked from 5 am to 1 pm. Because Plaintiff was on an airplane beginning at 1 pm and landing at 6:30 pm, the timecard change would most accurately reflect the hours of work and hours of travel.

59. Plaintiff further reiterated that he was **not** requesting seven (7) hours of night differential and was only trying to more accurately his actual work and travel hours given the pay issues. Mr. Napier's reasoning for denying Plaintiff his request was nonsensical and further exemplified to Plaintiff the Agency was clearly attempting to cover up their misdoings regarding the agents' pay.

60. Despite the Agency's knowledge of these pay disparities and it receiving reports of the apparent legal violations through the administration of the LEAP program, Plaintiff's concerns were never addressed or remedied.

61. The reportedly withheld and denied payments in this Complaint are approximate, thus, Plaintiff's estimated wages that are owed to him may be greater, given the fact that the Agency's pay systems that are currently available to Plaintiff are seemingly unable to account for all of the hours and money taken from Plaintiff's wage payments, thus making it difficult to obtain specific data and calculations in a pre-discovery stage of litigation.

62. Defendant and its officers are responsible under federal law for applying to Plaintiff the provisions of the FLSA, and other applicable federal and state pay and compensation statutes.

63. At all relevant times, Plaintiff's work activities were within Defendant's usual course of business as defined by FLSA.

64. At all relevant times, Plaintiff identified himself as an employee of Defendant.

65. At all relevant times, Plaintiff's work activities were integral to Defendant's usual course of business including but not limited to providing protecting for the Secretary of the VA.

66. At all relevant times, Plaintiff was legally presumed to be an employee of Defendant, pursuant to FLSA.

67. At all relevant times, Defendant was aware that they were legally required to timely pay Plaintiff all wages legally due to Plaintiff.

68. At all relevant times, Defendant was aware that Plaintiff worked overtime hours and LEAP pay had been erroneously accounted for.

69. As of the present time, Plaintiff has not received his wages owed.

*Facts Relevant to FLSA Retaliation*

70. Law enforcement retirement was codified into law and is provided for criminal investigators because of the significant duties and responsibilities their work requires. The language in the law requires at least twenty (20) years of service in a law enforcement covered position for an annuity rate of 1.7% of the average of the highest three salary years (non-law enforcement rate is 1%). The law enforcement covered person contributes 4.9% per pay period (biweekly) and the agency contributes 28.4% (biweekly). This is compared

to the regular rate for most government employees which is 4.4% per pay period (biweekly) and the agency contributes 15.5% (biweekly).

71. In or about July 2020, Mr. Sitterly, OSP Assistant Secretary, who Plaintiff complained about the wage violations to, signed the approval for criminal investigators, such as Plaintiff, to obtain 6c (law enforcement retirement) coverage. The language in the approval indicated that OSP approved 6c coverage for individuals 39 years of age or younger—regardless of military service—to be eligible for retirement.

72. This approval came three and a half weeks after Plaintiff's 40th birthday on June 28, 2020, which meant that Plaintiff missed the retirement cutoff age of 39 by three and a half weeks. Thus he was ineligible for the new law enforcement retirement policy.

73. Based on reason and belief, the timing of the approval was designed to make sure that Plaintiff would be ineligible for retirement because he had been the only one of his team willing to speak out about the pay discrepancies as the other members of the team were afraid of retaliation.  In fact, the only other Agent who spoke out about the pay discrepancies, Mr. Shakil Moss, also suffered retaliation at the hands of OSP management.

74. It was clear to Plaintiff that the approval was deliberately signed *after* Plaintiff would be ineligible to receive retirement as a way to retaliate against him for his continued reporting of and advocacy against the pay disparities.

75. Further, Mr. Sitterly, who had been made aware of the pay issues as Assistant Secretary of OSP, took over the Office of Accountability and Whistleblower Protection ("OAWP") in or around the end of 2020.  Plaintiff was struck by the inappropriateness of the very individual that had headed the office that was retaliating against him, was now in charge of the office processing whistleblowing complaints.

76. On or about March 19, 2021, Plaintiff filed a whistleblower protection charge with OAWP at the VA alleging retaliation based on his complaints about the mismanagement of the LEAP program which impacted the payment of Plaintiff and other Special Agents' wages.

77. In or around August 2021, *after* he had a meeting with OAWP, HR contacted Plaintiff stating that they would be moving him into law enforcement retirement. Plaintiff immediately realized that this was the VA's attempt to appease him after management realized that he would be moving forward with his complaint. However, HR only backdated his retirement to January 16, 2021, despite Plaintiff having worked at the VA since December 2018. This meant that Plaintiff would have a year of retirement missing.

78. Further, the change that was made to move Plaintiff into the law enforcement retirement coverage effective January 16, 2021, created additional pay discrepancies that have yet to be resolved. These pay discrepancies are a result of the correct retirement amount not being accurately deducted from his pay contributions resulting in money being refunded from Plaintiff's balance, which has the prospect of leading to significant discrepancies with his retirement account if they are not resolved.

79. At this time, Plaintiff is missing approximately $25,000.00 in agency law enforcement contributions due to his retirement being backdated to January 2021 and not December 2018.

80. Additionally, Plaintiff's retirement account is missing approximately $1,000.00 in his own law enforcement contribution from December 2018 to January 2021.

81. Further, Plaintiff's retirement account is missing approximately $2,500.00 in his own law enforcement contributions from January 2021 to present.

14

82. Plaintiff has been unlawfully denied his earned wages, which includes scheduled overtime and deferred wages.

83. Plaintiff has been unlawfully retaliated against due to reporting the Agency's wage and labor violations, as well as been subjected to retaliation for whistleblowing about the illegal actions of the Defendant, especially when he was denied law enforcement retirement.

84. Plaintiff is currently owed approximately $139,700.00 in unpaid wages and missing retirement contributions.

85. Plaintiff was forced to file suit due to the Defendants' inability and unwillingness to remedy their unlawful conduct that has cost Plaintiff significant financial strain as well as emotional distress.

86. The Defendants' discriminatory and retaliatory practices have been effectuated in violation of the FLSA.

*Other Factual Allegations*

87. At all relevant times, Plaintiff's work activities were within Defendant's usual course of business.

88. At all relevant times, Plaintiff identified himself as an employee of Defendant.

89. At all relevant times, Plaintiff's work activities were integral to Defendant's usual course of business.

90. At all relevant times, Defendant was aware that they were legally required to timely pay Plaintiff all wages legally due to Plaintiff.

91. At all relevant times, Defendant was aware that Plaintiff worked overtime hours.

## COUNT I

## VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938

92. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

93. The Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, et seq., applied to Plaintiff's employment with Defendants at all times relevant herein.

94. Section 206 of the FLSA, 29 U.S.C. § 206(a)(1)(C), mandates that employers pay all employees engaged in commerce or in the production of goods for commerce, minimum wages for their work in an amount set by federal law and for overtime payment for work performed over 40-hours in a workweek, wherein an employee receives pay of not less than one and one-half (1 ½) times the employee's regular rate for the first eight (8) hours worked.

95. Defendant was an Employer of Plaintiff within the meaning of the Fair Labor Standards Act 29 U.S.C. §§ 201 *et seq*. ("FLSA").

96. Under the FLSA, an employer must pay an employee their wages for their work. *See*, 29 U.S.C. §§ 201 *et seq*.

97. Here, Defendant knowingly failed to pay Plaintiff for his work, including scheduled overtime and deferred wages, in violation of the FLSA. Additionally, when Plaintiff brought the pay issues to the attention of management, Defendant did nothing to remedy the issue.

98. By failing and refusing to pay the Plaintiff and other employees the overtime pay required under law, Defendant has violated, in a willful and intentional manner, the provisions of the FLSA. As a consequence, at all times material herein, Plaintiff has been wrongfully and unlawfully deprived of overtime compensation and other relief for the maximum statutory period allowed under law.

99. As a result of the Defendant's willful and intentional violations of the FLSA, there is due and owing to Plaintiff various amounts of pay that have not yet been precisely determined. The employment and work records for Plaintiff are in the exclusive possession, custody and control of Defendant, and Plaintiff is unable to state at this time the exact amount owing to him.

100.    Defendant is under a duty to maintain and preserve payroll and other employment records with respect to plaintiff from which the amount of Defendant's back pay liability can be ascertained.

101.    Pursuant to the Back Pay Act, 5 U.S.C. Sec. 5596, Plaintiff is entitled to recover interest on his back pay owed for Defendant's failure to pay him FLSA overtime compensation.

102.    For Defendant's willful violation of the FLSA, Defendant is liable to Plaintiff for unpaid overtime and unpaid wages, an equal amount of liquidated damages, court costs, reasonable attorney's fees and expenses, interest, and any other relief deemed appropriate by the Court.

## **COUNT II**

**VIOLATION OF THE RETALIATION PROVISION OF THE FLSA, SECTION 15(A)(3)**
**[29 U.S.C. 215(a)(3)]**

103.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

104.    Section 215(a)(3) of the FLSA, 29 U.S.C. § 215(a)(3), prohibits retaliation against an employee because he "has filed any complaint or instituted or caused to be instituted any proceeding under or related to" the rights contained in the FLSA.

17

105.    Section 215(a)(3) of the FLSA states that it is a violation for any person to

"discharge or in any other manner discriminate against any employee because such

employee has filed any complaint or instituted or caused to be instituted any proceeding

under or related to this Act, or has testified or is about to testify in any such proceeding,

or has served or is about to serve on an industry committee." 29 U.S.C. 215(a)(3).

106.    The Act broadly defines "employee" as "any individual employed by an

employer" and "employ" as including "to suffer or permit to work." 29 U.S.C. 203(e)(1),

(g).

107.

108.    As described above, as a direct and proximate result of Plaintiff's complaints of

wage violations, Defendant deliberately approved law enforcement retirement *after*

Plaintiff would no longer be eligible in retaliation for his advocacy regarding unpaid

wages for himself and his team.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Special Agent Dieter Haggar, respectfully prays that this Court grant his the following relief:

a.  Enter a declaratory judgement finding that the foregoing actions of Defendant violated the FLSA;

b.  Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, retaliatory conduct described herein and to prevent similar occurrences in the future;

c.  Award back pay and compensatory damages in the amount of $500,000.00 , which includes treble damages, that would fully compensate Plaintiff for the economic loss, lost wages,

lost job benefits; physical and psychological injury, humiliation, embarrassment; and mental and emotional distress caused by the conduct of the Defendants alleged herein;

d.  Award damages equal to the unpaid minimum wages found to be due and owing as liquidated damages;

e.  Award prejudgment interest in the event liquidated damages are not awarded;

f.  Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

g.  Order such other relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: January 31, 2023

Respectfully submitted,

_____
Dionna Maria Lewis, Esq.
District Legal Group, PLLC
Bar No. 219016
700 Pennsylvania Ave, SE, Suite 2098
Washington, D.C. 20003
Phone: (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Plaintiff Dieter Haggar*